OF THE

## STATE OF MISSOURI

AT THE

OCTOBER TERM, 1909.

(Continued from Volume 224)

DANIEL F. BLAKE, Trustee in Bankruptcy of Estate of THOMAS J. MEADOWS, Doing Business as MEADOWS & CO., v. SUSIE L. MEADOWS, Appellant.

Division One, December 23, 1909.

1. FRAUDULENT CONVEYANCE: Bankruptcy Act: Relation of Trustee: Rights of Creditors. A trustee in bankruptcy, under the present act, does not stand precisely in the shoes of the grantee in a deed or of an assignee in an assignment. The bankruptcy act once for all arrests the individual action of the creditor in the collection of his debt, but it only arrests him, not his rights. The estate and subject-matter being *in custodia legis*, the law takes care of the creditor, and the trustee as the arm of the court acts for and on behalf of the creditor, so that whatever the creditor might do in avoiding the deed of the debtor for fraud, the trustee may do as his legal *alter ego*.

2. ——: ——: Title of Trustee: Subject to Outstanding Equities. The trustee in bankruptcy takes title to the bankrupt's property, including that conveyed in fraud of creditors contrary to the terms of the bankruptcy act, but he takes it subject to outstanding equities (not lost by estoppel or fraud) to which the title was subject in the hands of the bankrupt.

225 Sup—1          (1)

3. ————: ————: **Estoppel.** The wife of a bankrupt is not estopped to assert the equity of a resulting trust in land bought with her own money by her husband who without her consent or knowledge took the title in his own name. Such assertion of her right does not operate by way of a fraud on his creditors and make her deed fraudulent and void in a court of conscience.

4. ————: **Estoppel: Married Woman's Statute.** Estoppel is not applied to a married woman in her dealings with her husband precisely as to other persons. The confidential relation of husband and wife yet affects estoppel, and the married woman's acts have not abrogated the law on that subject. Estoppel *in pais* is not the creature of statute, but of elevated and refined ethics administered in courts of equity, and the married woman's statutes have not taken it away from the wife. Those statutes were intended to be a benefit to her, not to injure her.

5. ————: ————: **Wife: Acts That Estop Her.** If the wife permit or encourage her husband to hold himself forth as the owner of her property; if she voluntarily put the title in him, thus knowingly clothing him with *indicia* of ownership; if by conscious acts she acquiesce in his apparent ownership, knowing or having good cause to know that he is using the property to obtain credit, or conspire with him to that end; or, if, when applied to for information, she lie, deceive or mislead, she is estopped to claim the property when such claim renders her husband insolvent. But none of those facts is established by the evidence in this case, and in consequence the resulting trust in her favor is declared.

6. ————: **Deception: Using Wife's Money.** He who knows cannot be deceived. Where the creditor knew that the money which bought the land belonged to the wife, and knew her impecunious husband had used it and taken the title in his own name, the creditor had no right to believe she was giving him the land.

7. ————: **Estoppel: Resulting Trust: Using Wife's Property for Credit.** When the wife learned that her husband had taken in his own name the title to the land which she authorized him to buy for her with her money, the measure of her duty to his creditors did not require her to sue him *instanter*. If she requested and urged him to right the wrong, absent a fraudulent intent, she is not estopped as to his creditors, if thereafter she permitted the record title to remain in his name for three years, though during that time creditors, without her knowledge, were extending him credit relying upon his statement that he owned the land.

8. ————: **Credit: Commercial Agencies.** Where creditors claim they extended credit to a merchant upon the reports of commercial agencies, those reports, to be admissible, must state the merchant's ownership of the property with reasonable certainty. Reports based on mere conjecture, hearsay, rumor, supposition and such brood of uncertainties, are not sufficient to base credit upon.

9. **EVIDENCE: Commercial Agencies: Credit.** Unless the information upon which the reports of commercial agencies are based was furnished by the merchant himself, or unless guilty knowledge or notice of the contents of the reports is brought home to him, they are not admissible in evidence against him; and unless guilty knowledge or notice is brought home to the party sought to be charged with his fraud, they are not admissible against such party. [Per **VALLIANT, J.,** in separate opinion, in which all concur, and per **WOODSON, J.,** in separate opinion.]

Appeal from Clay Circuit Court.—*Hon. J. W. Alexander,* Judge.

REVERSED AND REMANDED (*with directions*).

*F. P. Divelbiss* and *Wash Adams* for appellant.

(1) When Thomas J. Meadows used the money of defendant, his wife, which had come to her by inheritance from her father and was her separate property, in the purchase of the farm in controversy, a trust thereby resulted in her favor and the land in equity belonged to her. The land was paid for by her checks only. If her mother had any interest it passed to defendant in December, 1900, when her mother died. Broughton v. Brand, 94 Mo. 169; Seay v. Hesse, 123 Mo. 450; Hoffman v. Hoffman, 126 Mo. 486; Jones v. Elkins, 143 Mo. 651; Stickney v. Stickney, 131 U. S. 237. (2) The land being in equity her property, the conveyance made by Thomas J. Meadows to defendant was not a fraud upon his creditors, but was a valid and lawful conveyance. Deberry v. Wheeler, 128 Mo. 85; Marsten v. Dresen, 85 Wis. 530; Seay v. Hesse, 123 Mo. 450; Payne v. Twyman, 68 Mo. 339; Clowser v. Noland, 133 Mo.

221; Metsker v. Bonebrake, 108 U. S. 66; Bennet v. Straight, 63 Iowa 620; Garner v. Bank, 151 U. S. 420; Hanselt v. Harrison, 105 U. S. 401. (3) The statutory separate estate of a wife cannot be taken by any process of law for the debts of her husband. R. S. 1899, sec. 6869. (4) "The trustee in bankruptcy takes just such title as the bankrupt had, and no better or greater title, and subject to estoppel and all liens or equities to which the title was subject in the hands of the bankrupt." Bush v. Export Storage Co., 136 Fed. 920; Hood v. Blair, 91 N. W. 705; Duplan Silk Co. v. Spencer, 115 Fed. 690; Loveland on Law & Proc. in Bankruptcy (2 Ed.), sec. 173; Stewart v. Platt, 101 U. S. 731; Cook v. Tullis, 85 U. S. (18 Wall.) 332; Dudley v. Easton, 104 U. S. 99; 5 Cyc., 341; In re Standard Laundry Co., 116 Fed. 478; Brandies v. Cochrane, 112 U. S. 344; Nichols v. Eaton, 91 U. S. 716; In re Mullin, 101 Fed. 413; In re Hanna, 105 Fed. 587. (5) "The title which passes to the trustee is limited to such property as might have been recovered by creditors in whose right the trustee takes under the laws of the State, and as may be recovered by him under sec. 70e of the Bankrupt Act." A right resulting by estoppel in favor of a particular creditor does not pass to the trustee in bankruptcy. "Fraud, actual or constructive, is a necessary element to give the trustee in bankruptcy a right of action." Bush v. Export Storage Co., 136 Fed. 920. (6) "A married woman cannot lose her land, separate or not separate estate, by estoppel *in pais* without actual fraud, if even by it." Waldren v. Harvey, 54 W. Va. 609; Brant v. Coal & Iron Co., 93 U. S. 327; Baker v. McInturff, 49 Mo. App. 509; Hyde v. Powell, 47 Mich. 156. (7) There was no purpose on the part of defendant to give her husband fictitious credit. The land was in his name four years before he went into business. He was not in business while Mrs. Cummings lived. She died in 1900. Mere passive conduct or silence will not estop a married woman. Ingalls v. Ferguson, 138

Mo. 358; Dull v. Merrill, 69 Mich. 49; Marstin v. Dresen, 85 Wis. 530; Bank v. Lee, 13 Pet. 107; Brant v. Coal & Iron Co., supra; Burke v. Adams, 80 Mo. 514; Garner v. Findlay, 110 Fed. 123; McClain v. Abshire, 72 Mo. App. 390; Matador L. & C. Co. v. Cooper, 87 S. W. 235. (8) Defendant testified she had no knowledge that her husband was doing business on credit. He informed her his business was in good condition, and she let him have money to increase his stock, and put into his business; under such circumstances there is no estoppel. DeBerry v. Wheeler, 128 Mo. 85; Scrutchfield v. Sauter, 119 Mo. 615; Alkire Grocer Co. v. Ballenger, 137 Mo. 369; McClain v. Abshire, 72 Mo. App. 390; Hudson v. Wright, 204 Mo. 412. (9) The alleged declaration of Thomas J. Meadows to J. T. Hurt, that the land was his, was not admissible and should not be considered by this court in deciding this case. Maffi v. Stephens, 93 S. W. (Tex.) 158. (10) The commercial reports of R. G. Dun & Co. and Bradstreet were not admissible and should not be considered in this case. Maffi v. Stephens, supra. (11) Those creditors of Meadows & Co. who testified they relied on the commercial reports cannot rightly invoke the doctrine of estoppel, because these reports instead of being fit for reliance, threw doubt upon the fact itself by saying ''He is credited with owning'' and ''He is said to own.'' None of these creditors examined the records or knew or relied thereon. The reports show Thomas J. Meadows declined to make any statement. Estoppel must be certain to every intent. Mills v. Groves, 36 Ill. 456; Brant v. Coal & Iron Co., 93 U. S. 327; Standard Mfg. Co. v. Errott, 135 Fed. 750. (12) The bank and Roney knew all the facts concerning the purchase of the land with the wife's separate means, and cannot for that reason invoke estoppel. Hequenbourg v. Edwards, 155 Mo. 523. The knowledge of Hurt was the knowledge of the bank. Rhinehart v. Bank, 89 Mo. App. 511; Lindsay v. Brooks, 82 Mo. App. 301. (13) The lower court

erred in admitting the testimony of Henderson that Thomas J. Meadows told him "I own a good farm in Clay county," and that Hurt told him the same thing. These statements were not part of the *res gestae* and are not competent as against this defendant. The creditor should have searched the record; he had no right to rely on anything else. Maffi v. Stephens, 93 S. W. 158.

*James M. Sandusky, Lavelock & Kirkpatrick* and *Karnes, New & Krauthoff* for respondent.

(1) The authority relied on by the creditors of the husband in the court below, and which is controlling here, is, Singer Manufacturing Co. v. Stephens, 169 Mo. 1. An attentive reading of that case will show that it is on all-fours with the case at bar, with this exception: In the case of the Singer Manufacturing Co. v. Stephens, property belonging to a daughter was placed of record in the name of her father. In the case at bar, title was of record in the name of the husband, while the land was paid for with the money of the wife. As will be shown in a subsequent chapter of this brief, a wife is now deemed *feme sole,* and is charged with the principles of estoppel precisely as if she were unmarried, so, accordingly, there is no essential difference between the case at bar and the case of Singer Manufacturing Co. v. Stephens, supra. And on the authority of that case, the right of the creditors to enforce as against the wife the payment of the debts which the husband incurred upon the faith of his apparent ownership of the land in question, is beyond controversy. 2 Pomeroy's Eq. Jur. (2 Ed.), sec. 805, p. 1115; 2 Beach on Mod. Eq. Jur., secs. 1096, 1103, pp. 1188, 1190; 2 Pomeroy's Eq. Jur. (2 Ed.), sec. 811, p. 1130; 2 Beach on Mod. Eq. Jur., sec. 1105, p. 1192; Rieschick v. Klingelhoefer, 91 Mo. App. 1; Riley v. Vaughn, 116 Mo. 169. Defendant is estopped from claiming the land in controversy against those who extended credit to her hus-

band, believing he owned .it.   It was defendant's con-
duct that misled creditors to their prejudice and made
it possible for her husband to obtain credit on his ap-
parent ownership of the Clay county farm; she clothed
him with authority to do just what he did, *viz.*, obtain
credit from those who dealt with him and relied on his
ownership of this property, and believed him entitled to
credit accordingly.   It is not denied that defendant
knew from April or May, 1898, to February, 1905, that
the record title to this land stood in the name of T. J.
Meadows, and if she did not disclose this fact to her
mother in her lifetime, it suggests that she was satisfied
with the title as it stood.   Defendant was familiar with
all the facts and understood the advantage to her hus-
band, in a business way, of owning this farm or having
the credit of owning it, and, whether he in fact owned
the land, or was merely the ostensible owner, and ob-
tained credit as if he were such owner with defend-
ant's consent, can make very little difference in this
case.   It was her course of dealing, or method of per-
mitting her husband to deal with the farm as he did,
that gave him credit, and now she will be precluded
from claiming the land against those whom her con-
duct misled to their prejudice.   It is universally recog-
nized that, if one of two innocent parties must suffer,
the loss will fall on the one whose agency occasioned
the loss; this is because the resulting wrong producing
loss must be suffered by the one inducing it.   This is
the equitable principle upon which estoppel *in pais*
proceeds; it is not a harsh rule of law; it only recog-
nizes and enforces simple justice between man and
man.   Defendant's course of conduct embraced every
element of estoppel *in pais*.   2 Pomeroy's Eq. Jur. (2
Ed.), sec. 804, p. 1115; 2 Beach on Mod. Eq. Jur. sec.
1103, p. 1188; 2 Pomeroy's Eq. Jur. (2 Ed.), sec. 811,
p. 1130; 2 Beach on Mod. Eq. Jur., sec. 1096, p. 1182.
Nor is it essential in this case that defendant should
have actually known her husband was obtaining credit

on his apparent ownership of the Clay county farm, or that she should have known creditors were actually relying on his apparent ownership of the land, provided her conduct justified such reliance, and it was in fact relied on. Singer Mfg. Co. v. Stephens, 169 Mo. 11; 2 Beach on Mod. Eq. Jur., sec. 1105, p. 1192. Persons extending credit to Thomas J. Meadows were entitled to rely upon his apparent ownership of the land as shown by the records. H. K. Porter Co. v. Boyd, 171 Fed. 312; Smith v. Willard, 174 Ill. 538; Rieschick v. Klingelhoefer, 91 Mo. App. 433; Kennedy v. Lee, 72 Ga. 41; Hirsch v. Norton, 115 Ind. 341; Pierce v. Hower, 142 Ind. 626; Besson v. Eveland, 26 N. J. Eq. 468. (2) A married woman is a *feme sole* as to her property rights, and is subject to the law of estoppel *in pais,* as any other property-owner. Leete v. Bank, 115 Mo. 204; Riley v. Vaughn, 116 Mo. 178; Iseminger v. Criswell, 98 Iowa 382; Hopkins v. Joyce, 78 Wis. 443; Van Dusen v. Hinz, 108 Wis. 178; Smith v. Willard, 174 Ill. 538; Cowling v. Hill, 69 Ark. 350; Humes v. Scruggs, 94 U. S. 32; Besson v. Eveland, 26 N. J. Eq. 468; Pierce v. Hower, 142 Ind. 626; Hauk v. Van Ingen, 196 Ill. 20. Under the present rulings of our appellate courts in this State, a married woman is strictly a *feme sole* so far as her right to control, or deal with her property is concerned; she may contract with a stranger, or with her husband, and she may convey her lands with or without her husband joining, whether it be her separate equitable estate or merely a legal estate. To say then that she cannot be estopped is to say that she may commit a fraud, and a court of equity is powerless to prevent the fraud, or grant a remedy, or that she may commit a civil wrong and be above the law. Under the old law, as she could not bind herself directly by contract, she could not do it indirectly by estoppel; but as she is now in law a *feme sole* and may control her property as any other person, so may she be estopped under the same conditions as

other persons. (3) The declarations of T. J. Meadows to J. T. Hurt in the Commercial Bank at Lawson April 7, 1898, when making out the checks to the Smith heirs in payment for the land in controversy, were admissible in evidence and properly admitted on the trial of this cause. The answer concedes that Meadows was at that time, and for the purpose of purchasing the land, the agent of both Mrs. Meadows and Mrs. Cummins. Story on Agency, sec. 134; Mechem on Agency, sec. 714, p. 537; 1 Greenl. on Ev., sec. 113; 1 Ency. of Ev., p. 538; Smith v. Willard, 174 Ill. 538; 1 Am. and Eng. Ency. Law (2 Ed.), pp. 690 to 695, notes; Bergman v. Railroad, 104 Mo. 86. (4) The trustee in bankruptcy was the only proper party to maintain this suit. Treseder v. Burgor, 130 Wis. 201; Ruhl-Kobelgard Co. v. Gillespie, 61 W. Va. 584; York Manufacturing Co. v. Cassell, 201 U. S. 344; Landis v. McDonald, 88 Mo. App. 335.

LAMM, P. J.—Thomas J. Meadows, merchant in the village of Lawson, Ray county, Missouri, doing business under the name and style of "Meadows & Co.," on May 10, 1905, was adjudged a bankrupt by the district court of the United States for the western division of the western district of Missouri. On due steps taken, Daniel F. Blake was appointed trustee of the bankrupt estate and took upon himself the burden of administering the trust. Presently said Blake lodged his bill in equity in the Clay Circuit Court, charging (among other things) that Meadows in March, 1898, by a deed duly executed by the then owners, became seized in fee of the southwest quarter and the south half of the northwest quarter, section 35, township 54, range 30, in Clay county; that he took possession under his deed and thenceforth represented himself, with the knowledge and consent of defendant, as the owner; that subsequently he became indebted to divers persons in sundry sums, proved and allowed

against his estate in bankruptcy; that in February, 1905, intending thereby to hinder and defraud his creditors, he, by a deed put of record, conveyed said farm to his wife, the defendant Susie L., said deed reciting a consideration of $8,000; that the deed was without any consideration in fact, but on the pretended consideration that Susie L. had paid the purchase price at the time of the conveyance to Thomas J. in 1898, and that the conveyance to her was an execution of a pretended trust arising on such payment of the original purchase money; that such pretended consideration should not avail as legal or valid because Susie L. at the time had no intention of claiming the land as her own or claiming any indebtedness due her by Thomas J. by reason of her furnishing such purchase money; that if she furnished the purchase money it was not paid upon a purchase of the land in her own behalf or for her use and benefit, but in order to have the land conveyed to Thomas J. as his own and to enable him to obtain and have credit in carrying on business; further, that such pretended consideration should not prevail as a valid or legal one, for the reason that the title was allowed to remain in Thomas J. of record from April, 1898, to the 9th day of February, 1905, with the knowledge and acquiescence of defendant, during which time Thomas J., with her consent, held possession of the land, controlled and dealt with it as his own, held himself out as the owner and was recognized as the owner while engaged in business as a merchant which required him to incur liability and to obtain and have credit on the faith of his financial ability to discharge his obligations as they matured; that defendant well knew all this; that Thomas J. was thereby enabled to and did obtain credit upon the faith and belief of his ownership of said land and that the claims and demands allowed against his estate in bankruptcy were contracted and credit therefor extended on the faith and belief he

was such owner; that the conveyance to Susie L. left him without sufficient assets to pay such debts and the effect of it was to render him insolvent; and that, the premises considered, the deed is fraudulent and void as to such creditors and void as to the plaintiff as trustee in bankruptcy. Wherefore, etc.

After sundry intermediate steps and incidents, not material here, issue was joined by answer charging among other things that defendant's maiden name was Cummins; that she was the only child of Madison B. and Emma J. Cummins; that Madison B. died in February, 1898, Thomas J. Meadows becoming his administrator; that on the 6th of April, 1898, defendant and her said mother, acting through Thomas J. as their agent, purchased the land in controversy; that all of the purchase money (except $2500) was on deposit in the Commercial Bank of Lawson in the names of defendant and her said mother, respectively, came from the estate of Madison B. and had been paid over to them by Thomas J. as administrator; that the purchase price of the land (except said $2500) was paid by checks drawn by said Thomas J. against the said accounts of defendant and her mother, said checks being signed respectively by the names of defendant and her mother by said Thomas J.; that said $2500 was borrowed for defendant and her mother from one J. H. Roney and was subsequently paid out of moneys belonging to defendant and her mother, derived from their separate estates; that defendant and her mother were wholly unfamiliar with legal blanks, documents, forms of conveyances, of the manner of executing deeds or mortgages and business generally; that without the knowledge or consent of defendant or her mother, said Thomas J. took title to the land in his own name and that defendant's mother died in December, 1900, intestate, without knowledge of the fact that Thomas J. in violation of his trust had taken title in his own name, she at all times supposing that title to be in herself

and Susie L., her only heir; that this defendant did not learn for a long time that the title had been taken in the name of Thomas J. and, as soon as she found it out, demanded of him that he put the title in her name and that of her mother where it belonged; that frequently before and after her mother's death she requested that the deed be corrected and the title placed in the names of the rightful owners; that Thomas J. at all times expressed a willingness and promised to comply with such request but failed to do so until he executed a deed to defendant in February, 1905; that Thomas J. paid none of the consideration for the purchase of the land; that the conveyance to defendant in February, 1905, was only doing what in law, equity and good conscience he ought to do, for that he held the title in trust for defendant and her mother and, after her mother's death, for this defendant alone; that said conveyance was and is no fraud upon the creditors of Thomas J. nor was it made for the purpose of hindering, delaying or defrauding anyone but, to the contrary, was made solely for the purpose of executing the trust resulting as aforesaid; that Thomas J. did not engage in a business necessary for him to incur debts with the knowledge or consent of defendant or her mother, nor hold out to the world with their consent or knowledge the land as his property, nor was he extended credit upon the faith of such ownership; that defendant had good cause to believe and did believe that Thomas J. was free from debt and in a prosperous financial condition and that defendant at no time knew or had reason to believe that he was in debt or had incurred liability, or that anyone was extending him credit upon faith or apparent ownership of said land and that while the mother lived she and defendant, and, since the mother's death, this defendant, at all times claimed to be the absolute owners of said property, received the rents, paid the taxes and exercised the usual and ordinary rights, dominion and control over the property

incident to absolute ownership and made improvements thereon.

The reply, pleading no new matter, denied *seriatim* the averments of the answer.

At a trial on the merits a decree went in favor of plaintiff and defendant appeals.

The record is of great volume and no good purpose would be subserved by spreading on the pages of our Reports the evidence in detail. It appears therefrom that Emma J. Cummins was a very old lady (three score and ten) who died two years after her husband; that her husband, Madison B., died out of debt and seized of considerable estate in Ray and adjoining counties, leaving her as his widow and defendant as his only child and heir; that Thomas J. Meadows, married to defendant some seven or eight years, was about thirty-eight years old and was possessed of no estate; that he was appointed administrator of his father-in-law's estate and subsequently of that of his mother-in-law; that there being ready money on hand on the death of Madison B., the question of safely investing it became a matter of family discussion with the result that Thomas J. acted on behalf of his wife and mother-in-law in the purchase of the land in question in Clay county for $9,600, taking title in himself. Not a penny of the purchase money was paid by him out of his own means but all of it came from the separate estates of his wife and mother-in-law, share and share alike. There was abundant evidence showing that this purchase was on behalf of the two women, who, unfamiliar with business forms and ways, trusted the whole transaction to him as their agent and lived with him under one roof as one family. They took no part in negotiating the purchase, in concocting or delivering the deed or in making payment and were not present at any step. They expected the title to be taken in their names. Mrs. Cummins died without knowing it was not. The defendant knew no better

until a month or so after the deed was returned, after record, by the recorder of Clay county, at which time she first saw it and read it over. It was shown (and not contradicted) that defendant, on then ascertaining the title did not stand in the names of her mother and herself, but in her husband's, requested him to correct the deed and put the title in the rightful owners and he promised to do so. Ascertaining subsequently he had neglected to perform his promise, the same request was again made and the same promise given. These requests and promises were renewed from time to time under similar circumstances until finally in February, 1905, the deed was made. The mother was not told because she was old and defendant did not want to worry her.

If this were the whole case, there could be no question about the law of it. Under such circumstances there was a resulting trust in favor of those who furnished the purchase money for the land and a clear equity to have the same enforced. Equity considering that done which should have been done, the execution of the trust by the conveyance of the husband to the wife would be but an act of tardy justice, absent any evidence that the farm, or its purchase money, was an out-and-out gift to Thomas J. Meadows, and we see no competent evidence of that sort.

But there is something else in the case and that something else is claimed by learned counsel for plaintiff to estop the wife from the right to have the trust executed, and to make the conveyance void as in fraud of the creditors of her husband. This contention seeks other facts, viz.:

The suit was brought on behalf of those creditors claiming to extend credit on the faith of Meadows' ownership of the land. The decree proceeds on that theory and, omitting some creditors from its benefits, enumerates a list entitled to a lien for their debts aggregating $14,387.04. One of these is the Commer-

cial Bank of Lawson, having claims aggregating $7,-901.93; another is one John Roney, having a claim for $675. In taking the laboring oar in proof of the allegation that faith and credit were given by the respective creditors to Meadows' ownership of the land, plaintiff put in some evidence pertinent to the bank, other evidence pertinent to Roney, still other pertinent to the other members of the favored class of creditors, and some common to all. It will serve a useful purpose to preserve that line of distinction. Accordingly under *a, b, c* and *d* we will severally state the tendency of the testimony common to all, that pertinent to the bank, that pertinent to Roney and that pertinent to creditors other than the bank and Roney.

(a) Common to all. Keeping in mind facts already disclosed, it seems that for the rise of four years after the purchase of the land, *viz.,* from April, 1898, to December, 1902, Meadows was not engaged in the mercantile business. The record shows that during the lifetime of his mother-in-law he filled the role of man of affairs to her and to his wife, renting out not only the Clay county land but other tracts of cultivating land in Ray county belonging to the Cummins estate, collecting the rents, attending to improvements of some magnitude, and administering on the estate of Madison B. The mother-in-law died in 1900, and Meadows added to his occupation that of administering on her estate. The record does not disclose that his relations with the two women were in any wise strained. He seems to have had their full confidence and trust. They lived in the village of Lawson. The lands belonging to the Cummins estate were elsewhere. In paying taxes his habit was to take tax receipts in his own name on all these lands, including that in dispute. There is no contention that he used his own money to pay the taxes on other land or that he appropriated the rents of any other land, but it is contended that he, as proprietor, appropriated the rents of the Clay county land

and paid the taxes out of his own means. On this score it may be said that the testimony did not disclose that he had a very definite or settled idea of *meum et tuum*, or of maintaining a line of cleavage between his own and his wife's separate means. It is shown that he drew checks to pay the taxes on the Clay county land against his own bank account, but how that account was made up is not clear. Defendant testified that she furnished the money to pay these taxes. For the first two or three years he put the rent money of the Clay county land in the bank to his own credit. It is not clear that she knew such to be the fact. For several years next before he conveyed the land to her such rent was put to her credit in the bank. At all times prior to the conveyance Meadows assumed to rent the land out in his own name as landlord. The tenant dealt with him alone and the only time the name of Mrs. Meadows was mentioned between them was when the tenant asked some improvements and Meadows told him he would see his wife about it. It seems that improvements of some magnitude were made on the farm at the expense of the wife. While there was testimony to the effect that Meadows assumed to control the Clay county land as proprietor it also seems he assumed the right (without any express authority shown and without her knowledge) to sign her name to promissory notes, and, without any express authority shown, to draw checks against her bank account, signing her name to such checks. Knowledge that he was claiming the land was not brought home to the defendant. No creditor inquired of her in that behalf and no statements of hers tending to prove she considered the land her husband's were shown.

In December, 1902, Meadows bought into a small mercantile concern in Lawson. She states she was opposed to his doing so and put her objection on the ground that he had other business to attend to. If she feared his business capacity the fact is not shown. She

acquiesced in his wishes and furnished him a small amount of money ($350) to buy into the business with one Walker as a partner. The partnership lasted a little while when she furnished, at his request, the money to buy Walker out—the entire purchase cost being $750. After buying Walker's interest, the business ran in the name of "Meadows & Co." There were some admissions of Thomas J.'s to the effect that his wife was the "Co." But these statements were not made in her presence, nor did she know of them nor was she consulted about the style of the firm. No creditor applied to her for information and she gave out none. So far as appears to us the even tenor of her domestic life, engrossed with the duties of a wife and housekeeper, unvexed with business affairs, flowed on until at a certain time she was asked to sign a statement that she was her husband's partner. This she refused to do, claiming it was not the fact. While the evidence is somewhat vague in some phases, yet it is substantially shown that from time to time her husband, under pretenses of needing to increase his business or enlarge his stock, applied to her for money. Covering the space of two years she furnished him so much as $3000. Whether he used it to increase his stock in accordance with his pretense or to pay bills as they matured is somewhat dark. But there is no testimony that she actually knew he was incurring liabilities or running in debt or establishing a line of credit with wholesale houses, unless an inference to that effect is to be drawn from the mere fact that he was conducting business as a merchant. As against this inference is her positive testimony that he informed her he was out of debt, keeping out and doing a prosperous business. In 1905 Meadows & Co. failed. The stock on hand was the rise of $4000; the accounts (good, bad and indifferent) several thousand, of which $2000 were collectible; and the mercantile debts were,

as said, $14,387.04 in the favored class, plus several thousands more which the trial court excluded from that class. It appears that defendant paid all the running expenses of the Meadows' household; and during the years her husband was in business dealt at the store and paid the bills like any other customer. So much for the evidence common to all.

(b) AS TO CREDITORS OTHER THAN THE BANK AND RONEY. Summarizing the testimony pertinent to such creditors, it was directed to establishing in favor of nine of them the allegation of the petition that credit was extended to Meadows on the strength of his ownership of the Clay county farm. Meadows always refused to make a statement to any commercial agency as the basis of credit. In June, 1903, the R. G. Dun & Co. commercial agency compiled the following memoranda and forwarded them to its offices, a copy of which for the next year or so was supplied to any wholesale house desiring one, viz.:

"T. J. Meadows is married and aged about 37 years. He is an old resident of the place. Considered of good general character, fair habits and ability. At one time he was associated with one 'Walker' under the style of Meadows & Co. In December, 1902, he started his present venture, succeeding to the business of John C. Wright. The 'Co.' of the firm is supposed to be his wife, Susie L. Meadows.

"The investment in the business is thought to represent a capital of about $1500, stock in trade averaging $1500 to $2000. T. J. Meadows is credited with owning a farm in Clay county, besides some town property estimated worth all told, $8000 or $9000. Mrs. Meadows is considered worth between $10,000 and $15,000, independent of her husband. Of what her means consist is not stated. They are entitled to homestead exemptions of $1500 and while it is not known in just what shape all the real estate is, after allowing for exemptions and other contingencies, there is

thought attached to the firm a net responsibility of
between $8000 and $10,000. Stock of merchandise said
insured.

"They appear to be doing reasonably well, obliga-
tions are reported met in a reasonably prompt man-
ner, and prospects generally are considered good."

All or most all of the creditors got the foregoing
report at one time or another.

In August 1904, the following was furnished by a
commercial agency to one creditor:

"Missouri, Ray County.

"December 26, 1902.—He is a married man, aged
about 40. Is an old resident of the place and is consid-
ered of good character, habits and fair ability. This
business was formerly owned and operated by John O.
Wright. For a short time he was associated with one
'Walker' under the style of Meadows & Co. Quite
recently Walker withdrew and L. J. Meadows is alone
in the business.

"He does not respond to written requests for a
statement. The investment is estimated at about
$1000 stock in trade running $1000 to $1200. He is
said to have considerable outside means, but nature of
same is not stated, and a definite estimate of net re-
sponsibility is not determined. His stock of merchan-
dise said to be insured.

"He has never failed in business so far as known
and locally he is reported prompt pay so far as known."

"1903. Ray County.

"January 13, 1902.—Upon further investigation
it is found that he has good farm and town property
valued at from $7000 to $8000 in own name and partly
exempt. Also has ready cash and making all due al-
lowance he is considered a net worth of from $5000 to
$7000.

"It is said doing a good business at this time, and
to be meeting obligations in a prompt and satisfactory

manner. Considered honest and industrious and believed worthy of confidence."

In 1904 the following special report was made to one creditor by an attorney:

"Supposed net worth? $10,000.00. Prompt, fair or slow pay? Prompt. Individual names (if a firm)? T. J. Meadows. Married or single? Married. Reputation for ability? Good. Honesty? Good. Age approximately? 40 years. Moral character? Good. Ever failed? No. Been sued? No. How long in business? 2 years. Business seem prosperous? Yes. Value of stock on hand (estimated)? $5000. Insurance? $2500. Is there any real estate in his own name, above homestead and encumbrance? Yes. Value? $5000. Do you know of any unsatisfied obligations, chattel mortgages, judgments, or claims in hands of attorneys? No."

The same creditor got the following report from R. G. Dun & Co.:

"Meadows, T. J. & Co., G. S., Lawson, Mo., July 9th, 1903. He is aged 38 years, married and has been engaged in this business here for some 8 months, prior to which he was engaged in farming. He is in very good standing personally, and thought to be of very fair business ability.

"Declines a statement, but upon investigation it is learned that he carries a stock of some $6000 or $7000. Aside from this he is said to own two or three good farms, and some residence property. After allowing for exemptions, and shrinkages, he is conceded a net worth of some $8000 to $10,000 as a basis for credit.

"Locally he meets his bills in a prompt and satisfactory manner, no complaints are ever heard from abroad, is doing a very good business and prospects are thought to be very favorable at this time. G. 3.

"February 17th, 1904.—Considered of good general character, fair habits and ability. Appear to be doing reasonably well. Meets obligations in a prompt

and satisfactory manner. Estimated worth $8,000 to $10,000. Has good prospects for success."

We find at least one creditor received the following under date of October 16, 1903, from a commercial agency:

"This business is conducted by Thomas J. Meadows and his wife, Susie L. Meadows, and they have been in the trade since September, 1902, when they succeeded J. C. Wright. It is strictly a partnership as between husband and wife.

"Previous to engaging in trade Mr. and Mrs. Meadows resided at Lawson.

"Information obtained by our representative regarding the investment and resources is as follows:

"Merchandise stock on hand, $4,000.

"Real estate title in name of Thomas J. Meadows and Susie L. Meadows, and free of encumbrances, $25,-000 to $30,000.

"Other assets, yes, but subject to exemptions, $34,-000.

"Total net worth exclusive of exemptions as a basis for credit (estimated), $20,000.

"Ever failed? No.

"Ever burn out? No.

"Insurance carried on merchandise stock? Yes.

"Bank with Commercial Bank, Lawson, Missouri.

"About $10,000 of the real estate is in the name of Thomas J. Meadows and the balance is in the name of his wife, Susie L. Meadows. Together Meadows and his wife own three farms that are worth $10,000 each. They also own their home in town and have some money loaned out, besides personal property of some value.

"Competent authorities state that Mr. and Mrs. Meadows have a financial responsibility over exemptions safely of $20,000 to $25,000. They are conducting the business upon a cash basis and are prompt in their payments.

"Authorities Consulted.

"No. 1. We consider them good for any credit they might ask. We frequently loan them money without security, but as a matter of fact, they have money to loan. Probably worth $25,000, and good pay.

"No. 2. We do not think any one need hesitate to grant them credit as they are amply responsible. Are worth $20,000 to $25,000 easily. Payments are prompt and frequently discounted."

And in 1904 the following report was furnished to at least one creditor:

"Meadows & Co.... General Store.... Lawson, Mo. Ray County.

"T. J. Meadows, age 41, married.

"Mrs. Susie L. Meadows, age 32, married.

"Statement asked for August 19th, 1904, but no answer received. This business was commenced under style of Meadows & Walker in the fall of 1902, R. J. Walker being a partner, sharing the profits. Later the style of the firm changed to above and is composed of T. J. Meadows and his wife. They are now reported to have $6,000 invested. Their stock is estimated worth $3,500 to $4,000; it is insured, but the amount is not learned. Said to own homestead in the name of Susie L. Meadows, worth $3,000, clear, and other real estate worth $15,000 to $20,000 in the name of the members of the firm located in Clay and Ray counties, Missouri. They are reported to be using $5,000 borrowed money.

"They are highly regarded personally, and Mr. Meadows, who has charge of the business, is considered a good business man. All bills as far as learned are promptly met, and propects appear fair. Authorities at the present time offer $15,000 as an estimate of their net worth."

One creditor, Mr. Henderson, testified that Thomas J. Meadows told him he owned a good farm over in Clay county and was all right financially in every way,

also that a Mr. Hurt told him he knew it to be a fact that Meadows owned a farm in Clay county in his own name. The first remark was made to Henderson by Meadows after he had established a line of credit and during a talk about increasing it. When Hurt gave Henderson his information does not appear.

The "credit men" of firms dealing with Meadows & Co. testified that they passed on the credit given Meadows on the information disclosed upon the fact that Susie L. Meadows was a partner and upon the fact that Meadows was said to own a farm. There is no proof of any land in his name except the farm in question.

(c) OF THE COMMERCIAL BANK OF LAWSON. Meadows' chief creditor is the Commercial Bank of Lawson. It received no commercial reports. It did business with Meadows on the theory his wife was a partner. The officers of the bank knew she had inherited a large property. When he became involved largely with the bank and before the renewal of some of his existing indebtedness, coupled with an increase thereof, it tried to get Mrs. Meadows to admit her partnership. She lived for years in the same little village, did business with the bank as a depositor and occasionally visited its counting room on business. The evidence discloses that the bank's dealings with Mrs. Meadows were as remarkable for what was omitted as for what was done. None of its officers did her the courtesy to consult her at any time. They gave her no pass book indicating the state of her accounts for quite a while after she became a depositor and when they did give her one it did not cover all her transactions with the bank, or give her much light on the disposition of her funds. Seemingly anxious about her account and the checks signed by her husband against it, the bank officers retained them for many years against a day of need. Finally the bank caused a statement to be prepared in writing, an admission of her partnership in the mer-

cantile business with her husband, and sent it to her
to be signed. She refused point-blank to sign it. The
matter dropped at that. Meadows' indebtedness to
the bank was evidenced by notes and to these notes
were signed the names of Thomas J. Meadows and
Susie L. Meadows. The original notes were not signed
in that way but the name of Susie L. appeared on the
renewals. Her name was signed by Thomas J. with-
out a particle of authority appearing in the record and
without her knowledge or consent. She seems to have
been treated as a mere cypher on all hands, *except
when pay day came.* Not only did the bank deal on the
credit of the name of Mrs. Meadows, that is, on the
theory she was a member of the firm of Meadows &
Co., but it claims to have dealt on the faith and credit
of Meadows' ownership of the Clay county land. It
seems that when the land was bought, Mr. Hurt, cashier
of the bank, knew that Meadows did not have a dollar
on deposit, knew that he checked the money belonging
to his mother-in-law over to the account of his wife
and then checked from his wife's account in payment
of the land, signing her name to the checks. In fact
Mr. Hurt drew these checks and brooded over and
somewhat moulded this transaction. He was the lead-
ing spirit in the bank. It had no discounting board but
him. He had authority to loan its money and make dis-
counts. At the time the land was purchased and Hurt
was writing the checks he remarked to Meadows:
"Tom, you are buying a nice farm here." Thereat
Thomas J. chestily replied: "Yes, and it's mine,
too; the folks are paying for it for me." There
is no contradiction to that conversation and the case
may proceed on the theory that the officer of the bank,
Hurt, who opened up a line of credit with Thomas J.
Meadows, knew that the money of Mrs. Cummins and
Mrs. Meadows bought the land and at the same time
was informed by Meadows, in the absence of his wife
and mother-in-law, that the land was intended for him

—that the folks were buying it for him. Such is the
basis of the bank's credit on the strength of the farm.
Subsequently Mr. Hurt, becoming solicitous about the
title to the farm, wrote a letter to the recorder of Clay
county to know whether the land still stood in Mead-
ows' name and was told in reply that it did. Subse-
quently he wrote another letter asking if the land was
transferred to Mrs. Meadows and was told that it had
been.

(d) OF THE RONEY CLAIM. Coming to the Roney
transaction, it may be told shortly. The Clay county
farm belonged to a family by the name of Smith.
Roney married one of the Smiths. His wife, being an
heir, united with the other Smith heirs in making a
deed to Meadows. Roney was one of the chief actors
in this sale. While he does not admit that he knew
that the money of Mrs. Meadows and Mrs. Cummins
paid for the land yet we have no doubt from the dis-
closures of the record that he was fully aware of that
fact at the time of the purchase. The purchase money
fell short $2,500, but of this $2,500, $1,200 was coming
to Roney's wife. He took a deed of trust on the land
which secured his wife's share plus $1,300 cash ad-
vanced. This indebtedness was paid off and we think
Roney is shown to have known it was paid by the
money of Mrs. Meadows, as in fact it was. Subse-
quently Roney, at the instance of Meadows, loaned one
Rhodus $475, and Mr. Meadows signed the note as
security. That note with its accumulation is allowed
against the bankrupt estate and constitutes the claim
known as the Roney claim. He testified that he con-
sidered Mr. Meadows good at the time but that as a
precaution he undertook to find out whether Meadows
still owned his farm and found out that he did. It fur-
ther transpired that the steps Roney took to ascertain
that fact consisted in going to Mr. Hurt at the Commer-
cial Bank and asking him. Asked in chief whether he
would have loaned him the money if he had known the

land had not belonged to him he answered: "Well, I considered Mr. Meadows good, and I don't know whether I would have or not. I could not say now what I would have done then."

So much for the facts.

The case may proceed upon the theory that a trustee in bankruptcy, under the present act, does not stand precisely in the shoes of the grantee in a deed or an assignee under our statute on assignments. The bankrupt law once for all arrests the individual action of the creditor in the collection of his debt, but it only arrests *him,* not his rights. The estate and subject-matter being *in custodia legis* the law takes care of the creditor, and the trustee in bankruptcy as the arm of the court acts for and on behalf of the creditor in that particular, so that whatever the creditor might do in avoiding the deed of his debtor for fraud, the trustee in bankruptcy may do under the present bankrupt act as a sort of *alter ego.* Such trustee takes title to the bankrupt's property, including that conveyed in fraud of creditors contrary to the terms of the bankrupt act, but he takes it subject to outstanding equities (not lost by estoppel or fraud) to which the title was subject in the hands of the bankrupt. While there are some uncertain and some discordant notes struck in the case-learning on the foregoing propositions, elaborated by diligent counsel in their briefs, yet we think the foregoing formulation of the law asserts sound doctrine. [See authorities in brief of counsel.] Without further exposition in that behalf, we pass to a consideration of the main proposition in the case, *viz.*:

Is Meadows' wife estopped to assert the equity of a resulting trust in the Clay county land arising from the fact that it was purchased with her inheritance money—her own estate and that of her mother whose heir she was? In other words, does such assertion of her right operate by way of a fraud on his creditors

Blake v. Meadows.

and make her deed fraudulent and void in a court of conscience?

It may be conceded that unless the confidential relation of husband and wife affects estoppel, or unless the facts relied on to establish the estoppel are insufficient, the decree should stand. Is estoppel applied to a married woman in her dealings with her husband precisely as to other persons? Counsel for respondent argue that way. Orally at this bar it was stoutly and with animation exclaimed that (in that regard) old things had passed away and all things had become new; that there issued from the married woman's enabling acts a still, small voice of command to courts, *viz.*: Forward! march!—that in the "gladsome light" of modern jurisprudence the wife appeared from head to foot armed as a *feme sole;* that she takes the bitter with the sweet, hence her new powers to contract and control her estate invoke a new responsibility and danger, to-wit, estoppel *in pais,* now to be applied to her unsparingly with rigid, stern and unaccommodating vigor. We think no consideration of this question can justly proceed by overlooking the fact that estoppel *in pais* is not the creature of statutory law. It was the creature of elevated and refined ethics administered in a court of equity. Moreover, when in former days it was held that estoppel *in pais* (except as to her separate equitable estate) did not lie against a married woman at all, the grace of freedom from that burden did not spring from statutory mandate but was a product of judicial reasoning to attain justice. Since that grace was not given by statute, even though an order has come to "forward, march!"—may we at least not look about a little to inquire if statutes (silent as ours in the giving or denying of it) take it quite away and to inquire: Who issued such order? On what road are we to march? How far? Where? If we are to march blindfolded we might say with a certain unhappy per-

son, who once hesitated long and doubted much in a certain crisis:

> If it were done when 'tis done, then 'twere well
> It were done quickly,

and have the thing over with. Estoppel *in pais*, created by the reason of the thing, should rest in reason and we are not called upon to write the law relating to the estoppel of a wife one inch beyond where reason and common-sense compel us to go; because, absent a statute on estoppel, if any command has come to march it is from the forum of reason and nowhere else. Statutes giving to the modern wife the right to contract, the right to her estate and to sue and be sued were intended as a benefit to her, and, rightly applied, they subserved a wise and good purpose. They were not intended to injure her. If she permit or encourage her husband to hold himself forth as the owner of property, if she voluntarily put the title to her property in him thus knowingly clothing him with *indicia* of ownership, or by conscious acts acquiesce in his apparent ownership, knowing or having good cause to know that he is using the property to obtain credit, or if she conspire with him to that end, or if (when applied to for information) she lie, deceive or mislead, it is not unreasonable to estop her to claim the property when such claim makes her husband insolvent. But the case made on this record is no such case as that. This wife was wronged by her husband. Although the statute forbade him to reduce his wife's estate to his possession except by her written consent, this husband proceeded to take her estate in the teeth of the law. The facts in this regard were open to the Commercial Bank and Roney at least. Neither of them had the right to believe that Mrs. Meadows was making an out-and-out gift of $10,000 to an impecunious husband, because such course of dealing as that is not usual. Those two creditors knew the equities of the wife and had the means at hand of knowing; and he who knows cannot

be deceived. As to the other creditors, when this wife found she had been wronged, what was the measure of her duty to herself and to the world at large? Was she required to *post* her husband? Did she have to sue him *instanter*, although the Statute of Limitations still treats her as under disability? Shall she quarrel and fuss with him and, what is more, blazon their squabble abroad in order that creditors may know how the matter stands? If the order to march requires that the peace of the household must be sacrificed in order to protect her property rights, that the love, honor and trust at the very root of the marriage relation shall be turned into the bitterness and gall of dissension and strife, then is the reform a reform?—Do we march forward or retreat? This wife did what she could in a gentle way to protect her interests, having in mind the fact that her husband was the head of the household, that she loved him and trusted him to comply with her requests and his own promises and that concord in the household was a wifely duty. We do not think she was estopped as to his creditors, absent a fraudulent intent on her part. We agree that in a given case estoppel *in pais* may now be applied to a married woman. Her right to contract and to control her estate results by necessary inference in that conclusion. But we cannot agree to apply the rule of estoppel harshly and with close particularity under any and all circumstances where the marital relation is involved. Such holding would injure the very class the married women's acts were intended to protect and would not subserve the welfare of society. The *personnel* of those involved in estoppel must not be lost sight of and it is not unreasonable to hold that facts sufficient to estop a Socrates or other "lord of creation" would not estop Susan, Jane and Mary—good Missouri mothers all.

Whatever the motives of the husband may have been in this transaction, there is no evidence implicat-

ing Mrs. Meadows in his fraud and this court has shown a disposition to sustain conveyances made under circumstances similar in some respects to those disclosed here. [DeBerry v. Wheeler, 128 Mo. 85; Alkire Grocer Co. v. Ballinger, 137 Mo. 369; Hudson v. Wright, 204 Mo. 412; Scrutchfield v. Sauter, 119 Mo. 615; Bank v. Winn, 132 Mo. 80.] We accordingly rule that she was no party to any fraud of her husband, that she had a clear equity in the land, that the conveyance attacked was the execution of a trust and not made in fraud of his creditors and that she was not estopped to claim the right to such conveyance. This holding disposes of the case.

But we may as well say a word further. We have held in a line of cases (Berry v. Rood, 168 Mo. 1. c. 333, et seq.; Trust Co. v. McMillan, 188 Mo. 1. c. 567, et seq.; Meyer v. Mining and Milling Co., 192 Mo. 162) that creditors charged with knowledge that corporation stock was issued as fully paid up to persons who paid for their stock in simulated values, or creditors who participated in such scheme, could not maintain an action against such stockholders for the difference between the par value of the stock and the amount paid, on the theory that they dealt with the corporation on the faith and credit that the stock was fully paid for in money or money's worth. How much less then can Roney and the bank through the trustee in bankruptcy sue Mrs. Meadows on the theory that they relied on Meadows' ownership when they must be held to know that he was not the true equitable owner of the property? Their knowledge of her elder and better equity defeated the running of estoppel under the peculiar facts present.

Again, plaintiff alleged and must be held to prove that the commercial creditors in the class favored in the decree extended credit on the faith of Meadows' ownership of the land in question. In order to maintain their case in this regard the commercial reports

set forth are relied upon. Those reports do not describe the land nor do they state that a deed is recorded in Clay county putting the title in Meadows. Nor do they as a rule positively assert ownership in Meadows of any land in Clay county. They do suggest and hint at such ownership. He is "said" to own, that is, there is a rumor or talk to that effect. He is "credited" with owning, that is, there is a belief to that effect. If confidence and trust were to be put on actual ownership of a valuable farm in Clay county it is inconceivable why more accurate information was not demanded than was received. Can a substantial commercial credit be predicated of such mere fog and guess work? The credit men testifying to that effect were speaking at long range, *i. e.,* a long time after the event itself. There is internal evidence in their depositions that they were construing on the stand the language of the commercial reports rather than testifying to a distinctly remembered fact—a sort of *nunc pro tunc* exposition. In that view of it, they were no better able to construe the language of the reports than this court. Construing that language for ourselves it cannot escape attention that much is made of the fact that Susie L. Meadows is a partner and that her credit and her property as well as the property of the supposed firm were a large and possibly controlling element in stiffening the credit of Meadows & Co. A credit on the faith of ownership to be so effective as to overturn a deed must reasonably produce substantial faith and confidence. Mere conjecture, hearsay, supposition, rumor and such brood of uncertainties are not the foundation upon which genuine faith is built in the business world. There was a copy of one report furnished to one creditor in August, 1904, which report bore date January 13, 1902—obviously a mistaken date. Assuming the original data were furnished in January, 1903, the report says: "Upon further investigation it is found that he has good farm

Blake v. Meadows.

and town property valued at from $7000 to $8000 in own name and partly exempt.'' That is the nearest to a statement of fact worthy to be the basis of credit we can find. The report itself is made of and concerning one ''L. J. Meadows.'' It either does not concern defendant's husband or mistakes his name. Admitting the name as well as the date are wrong then the report does not locate the farm and town property in any of the four quarters of the globe, let alone as within the reach of an execution levy and sale. Shall we say it meant a Clay county farm? If so, was the farm in the mind of. the commercial agency large enough or valuable enough to be a substantial element in establishing a mercantile credit? Is the valuation of $8000 or $7000 referable to the town property said to be owned by Meadows or to the farm? We do not rule that creditors must see for themselves. the actual record of an actual deed in their debtor's name; for Faith (says a sound lawyer—Heb. 11-1 *q. v.*) is the substance of things hoped for, the evidence of things not seen. But this whole bundle of reports, including the one last under exposition, is so palpably vague and uncertain in relation to the ownership of the actual land in dispute that we cannot see how faith and credit could be reasonably predicated on the information. Therefore we are inclined to the belief that the commercial reports should be rejected as a basis of credit because of uncertainty and vagueness. With that holding the mainstay of plaintiff's case is taken away.

The judgment is reversed and the cause is remanded with directions to enter a judgment in favor of defendant dismissing plaintiff's bill as on a hearing on the merits. All concur—*Valliant* and *Woodson, JJ.*, in separate opinion.

## SEPARATE CONCURRING OPINION.

VALLIANT, J.—Whilst concurring in all that my learned brother LAMM has said in the opinion in this case, there is one fact in the evidence on which I feel compelled to say a few words, lest if it be passed over in silence an improper inference might be drawn from it; I refer to the reports of the commercial agencies which seem to have been received in evidence without objection. The reports of commercial agencies have for so long been relied on in commercial transactions and are really of so much value that they cannot be dispensed with, but referring to them and trusting them as a guide or help in a business transaction is one thing, while bringing them into court as evidence is another thing. They are frequently admitted, and properly so, in evidence, when the proper foundation for their admission is laid. The information from which those reports are furnished by the commercial agencies to their subscribers is not infrequently, perhaps usually, furnished by the merchant himself, and when that fact is shown in a suit against the merchant charged with obtaining credit on a false showing the commercial report is competent evidence against him. Other instances might be supposed where the reports would be competent, but unless guilty knowledge or notice of the contents of the report is brought home to the party sought to be affected they are mere hearsay.

A merchant has a right, if he sees fit to do so, to consult the agency report and give or refuse credit on it, but that is his own private affair. If the report is false and he has been misled by it to his injury, he cannot charge it as a badge of fraud on some one who is in no way responsible for the information on which the report was founded and had no notice that trust was being placed on it.

225 Sup—3

The records of the commercial agencies are not public records of which all the world is required to take notice; they are private matters and to a certain extent are secret; they are given out only to subscribers and the subscribers are pledged to secrecy.

Mrs. Meadows had no notice of those reports, it is not sure that she ever heard of such an institution as a commercial agency. The reports on their face showed that her husband had refused to give the information but even if he had given it, it would not be evidence against Mrs. Meadows unless on further evidence it was shown that she knew it.

The reports were incompetent as evidence against Mrs. Meadows and if objection had been timely interposed no doubt the learned trial court would have excluded it. All the judges concur in the views here expressed.

## SEPARATE CONCURRING OPINION.

WOODSON, J.—I fully concur in all that my associates, Judges Lamm and Valliant, have written in this case; and in doing so I wish to emphasize what is said regarding the admission of the commercial reports preserved in the record. They are admissible in evidence in the first instance solely for the purpose of showing that the merchandise was sold upon the faith and credit given to them by the vendor, and not for the purpose of showing fraud on the part of the vendee—that must be done later and by other evidence. In order for the reports to be of any benefit to the vendor, he must not only show he sold the goods upon his faith in the truthfulness of the same, but he must go one step farther and show that the vendee had knowledge or notice of their existence, and that he, the vendor, relied upon the vendee's knowledge or notice of their existence in selling same. Both of those facts must be shown before the reports become vitalized;

but, nevertheless, they are admissible in evidence in the first instance without first showing said knowledge or notice.

It would be impossible for the vendor to show that he relied upon the vendee's knowledge or notice of the existence of said reports without first showing that they did in fact exist. As before stated, proof of notice of their existence on the part of the vendee, and that the vendor relied upon that knowledge or notice, vitalized the reports and gave them potential force as evidence, but until that is shown they are inanimate and binding upon no one; and if said notice is not subsequently shown, then the proper practice is to either move the court to strike out the reports, or request an instruction withdrawing them from the consideration of the jury.

The same practice prevails in the trials of causes involving fraudulent conveyances. The plaintiff must not only show fraud upon the part of the transferrer of the property, but he must go one step further and show that the transferee had knowledge or notice of that fraud before the fraud of the former is visited upon the latter; but the moment that is done, the fraud of the transferrer becomes the fraud of the transferee, and gives to it life and potentiality. If knowledge or notice of the former fraud is not brought home to the latter, then all evidence of the fraud of the former, previously admitted, should be stricken out or withdrawn from the consideration of the jury.

I understand both opinions so hold.